# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| **MARGUERITE R. MORRIS,** | * |
| Plaintiff | * |
| v. | *     Case No.: RWT 09cv2726 |
| **DENNIS L. NICHOLSON, *et al.,*** | * |
| Defendants. | * |

## MEMORANDUM OPINION

Defendants Dennis L. Nicholson ("Nicholson"), the Housing Authority of St. Mary's County ("HASMC"), Jan Barnes, Agnes Butler, Robert Gant Jr., Joan Gelrud, Darlene C. Johnson, and Andrew Kozak (the "Commissioners") have moved to dismiss, or, in the alternative, for summary judgment. For the reasons set forth below, the Court shall grant Defendants' motions.

## BACKGROUND

### I. The Parties

Plaintiff Marguerite R. Morris is a member of the Board of Directors of Leah's House, Inc. ("Leah's House"), Compl. ¶ 2, and is also its CEO and founder, *see* Compl. Exs. A, B, C, N, O & T. Leah's House is a 501(c)(3) nonprofit organization, which began operations in October 2005. Compl. Ex. U. According to the complaint and exhibits attached thereto, the shelter provides homeless women and children in St. Mary's County, Maryland (the "County") with a place to live, in both emergency and long-term transitional contexts, while teaching needed skills and otherwise equipping families to rise out of homelessness. *Id.*; *see also* Compl. ¶ 15.

HASMC is a housing authority created pursuant to state law. *See* Md. Code Ann., Hous. & Cmty. Dev. § 19-102(a) (West 2005); *see also* Compl. ¶ 5. Defendant Commissioners were, at all relevant times, the statutory "members" of HASMC. Md. Code Ann., Hous. & Cmty. Dev. § 19-102(b); *see also* Compl. ¶ 6. Defendants Nicholson and Phillips were employees of HASMC; Nicholson was the Executive Director and Phillips was the Program Manager. Compl. ¶¶ 3-4; *id.* Exs. A-B.

## II. The Program

The Rental Allowance Program ("RAP") is a program administered by the Maryland Department of Housing and Community Development ("DHCD") pursuant to state statute. *See* Md. Code Ann., Hous. & Cmty. Dev. § 4-1403. "The basic objective of the Program is to fund . . . monthly housing assistance payments on a short term basis to those income eligible persons or households that are homeless or at risk of homelessness." Md. Code. Regs. 05.05.03.02. Generally, DHCD arranges with a local government agency or nonprofit organization, the "local administering agency" ("LAA") in each county and Baltimore City to administer the program, providing the LAAs with funds to pay for housing for the homeless. *See* Md. Code Regs. 05.05.03.03 to .04. In St. Mary's County, the RAP LAA is HASMC. *See, e.g.*, Compl. Ex. D (sample RAP contract).

RAP contracts are three-party agreements between the LAA, the landlord, and the "recipient" – a tenant that is "a lower income household which receives housing assistance payments." Md. Code Regs. 05.05.03.03. Leah's House served for at least one month as a RAP landlord under four contracts with HASMC, the cancellation of which are at the center of Plaintiff's claims. Compl. ¶¶ 15, 19-20, 28, 39-58.

Pursuant to the four contracts, Leah's House was to provide housing for 12 months, the longest stay allowed under RAP, Md. Code Regs. 05.05.03.07, to Amanda Brown's family of

two, Samantha Treftz's family of three, Tomeka Washington's family of four, and Jenevieve Triggs. *See* Defs.' Mot. Ex. 1 ("Nicholson Mot. Aff.") ¶¶ 4-7; *id.* at Exs. 1-4. All four of the contracts were date April 1, 2009. Nicholson Mot. Aff. Exs. 1-4.

As a prerequisite to the RAP contracts, Leah's House and each of the recipients previously signed "Notices of Unit Availability" requesting that the HASMC inspect the proposed dwelling units. *Id.* The notices contain placeholders for "Housing Unit Description," "Number of Bedrooms," and "Rent to be Charged for the Unit." *Id.* Each of the notices indicates that the rent to be charged was $750.00.[1] *Id.*

The recipients and an HASMC employee, Dena Bell, also signed separate "Rental Allowance Program Certificates," confirming that the recipients were eligible for RAP and that rent would be paid by HASMC if the proposed units and leases were approved. *Id.* Each of the certificates contains a different "Amount of Rental Allowance Payment," totaling $1,370. *Id.*

According to Plaintiff, HASMC inspectors approved the units on March 18, 2009, and HASMC paid Leah's House for the recipients' April 2009 rent. Compl. ¶¶ 19-20. The payment totaled $1,370, representing $270 for Ms. Brown's family, $330 for Ms. Treftz's family, $500 for Ms. Washington's family, and $270 for Ms. Triggs. Nicholson Mot. Aff. ¶ 8. On April 23, 2009, another RAP Certificate was issued to Ms. Washington, indicating that her family had grown to five. Compl. Ex. L.

For the same time period, and for three of the four same recipients, Leah's House received $50 per family per night from the County Department of Social Services ("DSS"), totaling $1,500 per family for April 2009. Nicholson Mot. Aff. Ex. 5. Leah's House had been

---

[1] Plaintiff claims that she left the "Rent to be Charged for the Unit" lines blank when she submitted the Notices of Unit Availability, *see* Compl. ¶ 33, and that an HASMC employee later added the $750.00 figure, Pl.'s Opp'n 3. Plaintiff has filed "her copy" of the forms for comparison. *Compare* Pl.'s Opp'n Ex. Z, *with* Nicholson Mot. Aff. Exs. 1-4. Plaintiff explains she "left this area blank as she believes the subsidies given by the State through the Department of Social Services to house the homeless are for overall supportive services including shelter." Compl. ¶ 58.

receiving the DSS funding for Ms. Brown since November 1, 2008, for Ms. Treftz since June 5, 2008, and for Ms. Washington since November 6, 2008. *Id.* In an April 24, 2009 e-mail from DSS to HASMC officials, DSS disclosed that it had paid Leah's House for these recipients through March 31, 2009, and that it would pay for April 2009, but that it had plans to relocate all three families during May 2009, paying a prorated rate for that month to Leah's House. *Id.* The DSS payments were made pursuant to a Memorandum of Understanding ("MOU") between DSS and Leah's House, which provided for DSS to refer homeless women to Leah's House and pay for their lodging. Compl. Ex. U. For April 2009, Leah's House was paid a total of $5,870 by HASMC and DSS to shelter Ms. Brown, Ms. Treftz, Ms. Washington, Ms. Triggs and their families.

## III. Cancellation

According to Defendants, the RAP contracts with Leah's House were terminated because the DSS and RAP funds received by Leah's House exceeded the total amount permitted under the contracts. Defs.' Reply 8.

RAP regulations define a dwelling unit as a "room, including a hotel or motel room, apartment, house, or mobile home." Md. Code Regs. 05.05.03.03(B)(8) (emphasis added). In one letter, HASMC classified Leah's House as a single "Housing Unit" with four rooms, but also interpreted the definition of "dwelling unit," such that when applied to Leah's House, it "may allow a per unit rent charge of $750.00 per room per month." Compl. Ex. B. Thus, it is unclear whether HASMC deemed Leah's House one "unit" or four "units" – and whether the shelter should have been receiving $750 (one unit), $1,370 (amount on Rental Allowance Program Certificates), or $3,000 (four units) per month. The question is academic, however, because Leah's House received a total of $5,870 for April 2009, a sum exceeding the applicable limit under any method of calculation. *Id.*

Defendants first notified Leah's House that it was cancelling the RAP contracts in an April 27, 2009 letter from Phillips. Compl. Ex. A. The letter was addressed to "Leah's House[,] Attn: Margarite [sic] Morris[,]" and began with the salutation: "Dear Ms. Morris." *Id.* The letter subsequently referred to "you" and "your" without specifying who "you" stood for. *Id.* The letter disclosed that HASMC had learned that Leah's House was receiving DSS funds, and then stated that the RAP contracts would be terminated pursuant to contract paragraph 6(C). *Id.* That paragraph provides for the cancellation of such contracts in the event that the landlord breaches any contractual condition or if the landlord or any of its agents "engage in any fraudulent act, such as misrepresenting the amount of rent being charged for the Housing Unit." *Id.*

Upon receipt of the Phillips letter, Plaintiff wrote first to the County chapter of the NAACP complaining of years of harassment, ostensibly based on race and religion, conspiracy between the County government and another homeless shelter to shut down Leah's House, and retaliation for her speaking up about the same, culminating in the cancellation of the RAP contracts. Compl. Ex. N. On June 8, 2009, Plaintiff then wrote to Nicholson asking five questions in an effort to better understand why the RAP contracts were being cancelled. Defs.' Mot. Ex. 2. Plaintiff also requested that the Phillips letter be removed from public records, and that HASMC specifically document what it believed to be Plaintiff's "fraudulent" acts. *Id.* Plaintiff sent a copy of this letter to the County Commissioners, an official with the United States Department of Housing and Urban Development ("HUD"), the "Maryland State Prosecutor," the County chapter of the NAACP, the NAACP state office, and the Board of Directors of Leah's House.

Nicholson replied to Plaintiff's letter on July 1, 2009. Compl. Ex. B. The letter was addressed to "Marguerite R. Morris, CEO/Founder[,] Leah's House" and opened "Dear Ms. Morris[.]" *Id.* In the letter, Nicholson provided a summary of how the RAP contracts were made,

their terms, and how the terms were violated, referring to a "misrepresentation of the rent amount charged for the housing unit." *Id.* Nicholson did not state whether Leah's House over- or under-represented the actual rent charged in the context of the RAP funding – only that, when combined with the DSS funding, Leah's House received an amount that "significantly exceed[ed] the $750 per unit rent charge." *Id.* Nicholson sent a copy of this letter to the County Commissioners and a DHCD official.

Plaintiff responded by letter to the Commissioners on July 6, 2010, alleging that she had not completed the "Rent to be Charged for the Unit" on the four Notices of Unit Availability, and that someone else had "forged" the documents by writing $750 on the forms. Plaintiff further claimed the existence of a "conspiracy" between HASMC and another homeless shelter to shut down Leah's House, culminating in the cancellation of the RAP contracts, and she called for Nicholson's resignation. Compl. Ex. T. Plaintiff sent a copy of this letter to the same parties to whom she had sent a copy of the June 8, 2009 letter, adding the same DHCD official Nicholson had previously copied. *Id.*

On July 20, 2009, the County Administrator wrote to the Commissioners that his office had received correspondence from Plaintiff, complaining about the untimely and less-than-comprehensive response Plaintiff had received from HASMC. Nicholson Mot. Aff. Ex. 5. The County Administrator asked the Commissioners to keep his office informed of developments. *Id.* On July 24, 2009, the Commissioners replied briefly to Plaintiff. *See* Compl. Ex. C. The letter addressed "Marguerite R. Morris, CEO[,]" and opened "Dear Ms. Morris[.]" *Id.* The Commissioners wrote that they would not be requesting Nicholson's resignation and that they supported the decisions HASMC made in the administration of RAP. *Id.* The Commissioners sent a copy of their letter to only the County Administrator. *Id.*

On September 17, 2009, Plaintiff, proceeding *pro se*, filed a complaint against ten Defendants in the Circuit Court for St. Mary's County, Maryland. The complaint contains the following six counts: Count I – "defamation of character"; Count II – "malice – failure of Defendants to make reasonable inquiry"; Count III – "infliction of emotional distress"; Count IV – "conspiracy to divert funding"; Count V– "forgery"; and Count VI – "violation of Maryland Public Information Act".[2] Compl. ¶¶ 39-60.

The thrust of Plaintiff's complaint is that HASMC allegedly falsely accused Plaintiff of submitting fraudulent RAP funding applications and improperly cancelled RAP contracts with Leah's House. Compl. ¶¶ 15, 28, 31-33. Plaintiff alleges that three letters sent by Defendants regarding the termination of the RAP contracts are defamatory, *see id.* ¶¶ 7-14, 40-42, and that Defendants failed to make reasonable inquiry regarding her funding applications, *see id.* ¶¶ 44-48. Plaintiff also claims that Defendants failed to respond to her request for information in violation of the Maryland Public Information Act and retaliated against her for her complaints. *See id.* ¶¶ 30, 56, 60.

Defendants HASMC, Barnes, Gant, Gelrud, Johnson, and Kozak, removed the case to this Court on October 20, 2009.[3] Paper No. 1. These same defendants then filed, on October 26, 2009, a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (the "Motion" or "Defs.' Mot."). *See* Paper No. 8. Defendant Nicholson, who was subsequently served, filed a similar motion on November 17, 2009, which largely adopted and incorporated his codefendants' Motion. *See* Paper No. 9. Plaintiff submitted an untimely omnibus opposition, *see* Paper No. 15,

---

[2]    Plaintiff's proposed amended complaint, attached to her Second Motion for Leave to Amend Complaint, *see* Paper No. 22, contains the same six counts with minor modifications. *See infra* Analysis Part VII.

[3]    In their Notice of Removal, Defendants state: "To the extent Plaintiff claims retaliation and discrimination, they are claims made pursuant to Title 42 U.S.C. § 1983 and 1985. Accordingly, this action is properly removable pursuant to 28 U.S.C. §§ 1441(b) and 1443." Paper No. 1, ¶ 6.

and Defendants filed a consolidated reply in support of their dispositive motions, *see* Paper No. 18.[4] Plaintiff subsequently filed a Motion for Leave to File Surreply, *see* Paper No. 25, which Defendants have opposed, *see* Paper No. 28.

In addition, Plaintiff filed a Motion for Leave to Amend Complaint on December 3, 2009, *see* Paper No. 17, and a Second Motion for Leave to Amend Complaint on January 7, 2010, *see* Paper No. 22. Defendants oppose any amendment to the complaint. *See* Paper Nos. 21, 24.

## STANDARD OF REVIEW

"If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). Because both parties offer evidence to supplement the Complaint and their briefs on the Motions, the Court will consider them as motions for summary judgment. In evaluating a summary judgment motion, the court must assess whether there are any genuine issues of material fact and whether the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 302 (4th Cir. 2006); Fed. R. Civ. P. 56. "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting Fed. R. Civ. P. 56(e)). When ruling on a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

---

[4] Defendant Butler, who was later served, joined in the motions of her codefendants through their consolidated reply in support of their motions. *See* Paper No. 18 at 1 n.1.

## <u>ANALYSIS</u>

**I.      Notice Requirements of the Local Government Tort Claims Act**

Defendants argue that all of Plaintiff's state law claims are barred by the Maryland Local Government Tort Claims Act ("LGTCA"), Md. Code Ann., Cts. & Jud. Proc. §§ 5-301 to 5-304, because Plaintiff failed to comply with its notice requirement. *See* Defs.' Mot. 7-10; Defs.' Reply 2-5.

The LGTCA waives governmental immunity for "any judgment against [a local government's] employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment with the local government." Md. Code Ann., Cts. & Jud. Proc. § 5-303(b). HASMC is a "local government" for the purposes of the LGTCA. *See* Md. Code Ann., Cts. & Jud. Proc. § 5-301(d)(15). The Commissioners, Nicholson, and Phillips are employees of a local government for the purposes of the LGTCA. *See* Md. Code Ann., Cts. & Jud. Proc. § 5-301(c)(2)(i)-(iii). Plaintiff does not dispute that her claims are subject to the LGTCA.

The LGTCA requires that prospective plaintiffs give notice of their claims before filing suit:

> [A]n action for unliquidated damages may not be brought against a local government or its employees unless the notice of the claim required by this section is given within 180 days after the injury. . . . The notice shall be in writing and shall state the time, place, and cause of the injury. . . . The notice required under this section shall be given in person or by certified mail, return receipt requested, bearing a postmark from the United States Postal Service, by the claimant or the representative of the claimant. . . . [T]he notice shall be given to the corporate authorities of the defendant local government.

Md. Code Ann., Cts. & Jud. Proc. § 5-304(b)-(c).

Plaintiff filed a "Motion for Waiver of Notice Requirement." Paper No. 13. In her motion, Plaintiff appears to suggest that the following communications satisfy the LGTCA's notice requirements: (1) "several letters of complaint asking the defendants to provide information per the Maryland Public Information Act" and (2) an "inquiry with [Defendant] Darlene Johnson, asking if the [Commissioners] understood that they had left the plaintiff no choice but to pursue the matter in court." Pl.'s Mot. to Waive ¶¶ 1, 4. Plaintiff appears to further argue that Defendants had constructive notice because a St. Mary's County Commission member advised her that the County was anticipating a lawsuit, and because Defendant Johnson told her that the "[HASMC] Commissioners were informed of the impending law suit and that they understood the ramifications of their position." Pl.'s Mot. to Waive ¶¶ 3, 4.

In response, Defendants argue that: (1) Plaintiff's discussion of instances in which she may have given notice are entitled to no weight because they are not supported by affidavit; (2) Plaintiff's allegations about what County and HASMC Commissioners purportedly told her are inadmissible hearsay; and (3) notwithstanding the evidentiary concerns, nothing Plaintiff discusses meets the level of notice required by the LGTCA. Defs.' Reply 3-5.

It is undisputed that Plaintiff did not, within 180 days of her injury, make a written claim to the HASMC Commissioners stating the time, place, and cause of her injury. Furthermore, assuming they may be considered by the Court, her various alleged communications do not show that Defendants were on notice of the specific nature of Plaintiff's claims and therefore cannot satisfy the LGTCA's notice provision.

Plaintiff also invokes § 5-304(d) of the LGTCA, which provides: "Notwithstanding the other provisions of this section, unless the defendant can affirmatively show that its defense has been prejudiced by lack of required notice, upon motion and for good cause shown the court may entertain the suit even though the required notice was not given." Good cause must be shown

before the Court may examine whether Defendants suffered any prejudice. *See Wilbon v. Hunsicker*, 913 A.2d 678, 684 (Md. Ct. Spec. App. 2006). "Good cause exists when a claimant prosecutes a claim 'with that degree of diligence that an ordinarily prudent person would have exercised under the same or similar circumstances.'"[5] *Wilbon*, 913 A.2d at 693.

Plaintiff appears to suggest that good cause exists to waive the notice requirement because the County's "marked resistance to cooperating and treating the plaintiff in a fair and equitable manner" shows that notice would have been futile. Pl.'s Mot. to Waive ¶ 2. The County and HASMC, however, are legally distinct for the purposes of the LGTCA, rendering any discussion of the County irrelevant.[6] Moreover, any alleged, generalized resistance by Defendants is insufficient to establish futility. The Court will not invent good cause when none exists.

Accordingly, considering all the facts in evidence, there is no genuine dispute that Plaintiff failed to meet the LGTCA's notice requirement and Plaintiff has not shown good cause why the requirement should be waived. Defendants are therefore entitled to summary judgment as to all state law claims.

Even assuming, *arguendo*, that notice was properly given or can be waived, summary judgment is nonetheless still appropriate as to the state law claims because Plaintiff has failed to establish a prima facie case for any of her claims, as discussed more fully below.

---

[5]    Maryland Courts have recognized a number factors, or "earmarks of good cause":
> [1] excusable neglect or mistake (generally determined in reference to a reasonably prudent person standard), [2] serious physical or mental injury and/or location out-of-state, [3] the inability to retain counsel in cases involving complex litigation, [4] ignorance of the statutory notice requirement, or [5] misleading representations made by a representative of the local government.

*Prince George's County, Md. v. Longtin*, 988 A.2d 20, 35 (Md. Ct. Spec. App. 2010) (alterations omitted) (noting that even these factors do not "cover the universe of 'good cause' scenarios"). Plaintiff does not appear to argue that any of these factors apply to her case.

[6]    *Compare* Md. Code Ann., Cts. & Jud. Proc. § 5-301(d)(3) (pertaining to counties operating under Article 25 of the Code of Maryland, which includes St. Mary's County), *with* Md. Code Ann., Cts. & Jud. Proc. § 5-301(d)(15) (pertaining to housing authorities).

## II.    Counts I & II: Defamation / Malice / Failure to Make a Reasonable Inquiry

Count I alleges that Defendants defamed Plaintiff in the April 27, July 1, and July 24, 2009 letters, "maliciously and with intent to cause a belief that plaintiff was a dishonest and unfit person to engage in business." Compl. ¶¶ 40-42. Similarly, Count II alleges that the Commissioners, *see id.* at ¶ 44, "failed to investigate the truth of the facts in the letter concerning plaintiff," "failed to make any reasonable inquiry and were grossly negligent in such failure to inquire into the truth of the facts so published concerning plaintiff," and "printed and circulated [their letter] with such reckless disregard and carelessness as to their truth or falsity as to indicate an utter disregard of the rights of plaintiff." *See* Compl. ¶¶ 43-48.  Both counts thus appear to assert claims for defamation and shall be considered together.[7]

"Under Maryland law, to present a prima facie case of defamation, a plaintiff must establish four elements: (1) that the defendant made a defamatory statement to a third person, (2) that the statement was false, (3) that the defendant was legally at fault in making the statement, and (4) that the plaintiff thereby suffered harm." *Offen v. Brenner*, 935 A.2d 719, 723-24 (Md. 2007). "'Fault,' for the purposes of the prima facie case, may be based either on negligence or . . . actual malice, [which] is established when the plaintiff shows, by clear and convincing evidence, that the defendant published the statement in issue either with reckless disregard for its truth or with actual knowledge of its falsity." *Shapiro v. Massengill*,  661 A.2d 202, 217 (Md. Ct. Spec. App. 1995) (citations omitted).

---

[7]    "A defamatory statement is one which tends to expose a person to public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from having a good opinion of, or associating with, that person." *Offen v. Brenner*, 935 A.2d 719, 724 (Md. 2007). Whether a statement is defamatory *per se* is a question of law. *See Shapiro v. Massengill*,  661 A.2d 202, 217 (Md. Ct. Spec. App. 1995). Statements that are defamatory *per se* have an "injurious character" that is "self-evident." *Id.* If statements are only defamatory *per quod*, their "injurious effect must be established by allegations and proof of special damage." *Id.* The Court construes the complaint to allege that the letters are defamatory *per se*, as Plaintiff believes they were meant to "cause a belief that the plaintiff was a dishonest and unfit person to engage in business," and to "injur[e] plaintiff in her community." Compl. ¶¶ 40-42, 48. Plaintiff does not claim that any context is required to understand the alleged accusations of fraud. Accordingly, the Court will treat the statements, if defamatory, as *per se* defamatory.

Defendants argue that none of these elements is met, in that: (1) the letters, if defamatory to anyone, are not defamatory to Plaintiff;[8] (2) the letters are truthful; (3) any defamation of Plaintiff was done by Plaintiff herself, not Defendants; and (4) Plaintiff fails to identify her damages. Defs.' Mot. 10-15; Defs.' Reply 7-11.

### A.      Truth or Falsity of the Statements

None of the three letters contains actionable falsehoods.  First, Plaintiff's contention that the third sentence in Phillips' April 27, 2009 letter is false and defamatory is misguided.  The sentence simply quotes language contained in a contract stating that the LAA reserves the right to terminate the agreement if the landlord breaches any contractual provision or misrepresents the amount of rent being charged. Compl. Ex. A. Moreover, there is no evidence to suggest that this letter was circulated to a third party; it was addressed and faxed only to Leah's House.

Second, Nicholson's July 1, 2009 letter provides additional information explaining why the contracts were cancelled, namely because the $5,870 Leah's House received for April 2009 "substantially exceeds the $750 per unit rent charge declared on the signed Notice(s) of Unit Availability." Compl. Ex. B (emphasis omitted). Because HASMC calculated the "rent amount charged" as the total amount Leah's House received for April 2009, under HASMC's view, Leah's House failed to report a correct rent amount.[9] The letter is neither false nor defamatory, and in no way suggests that Nicholson wrote "maliciously and with intent to cause a belief that plaintiff was a dishonest and unfit person to engage in business." Compl. ¶ 41.

Third, the Commissioners' July 24, 2009 letter merely advises that they would not request Nicholson's resignation and that "[w]e believe our staff is correctly administering funds

---

[8]    Defendants argue that Plaintiff lacks standing to assert claims for defamation, failure to make reasonable inquiry, conspiracy to divert funding, and forgery because each involves Leah's House rather than Plaintiff. Defs.' Mot. 10, Defs.' Reply 5-7.  To the extent Plaintiff attempts to assert claims on behalf of Leah's House, these claims must be dismissed for lack of standing.

[9]    Even assuming, as Plaintiff contends, that Plaintiff did not complete the rent to be charged on the Notices of Unit Availability, her omission would still constitute a failure to provide the correct rent amount.

through the State of Maryland Rental Allowance Program and our Board supports the determination made by Mr. Nicholson and his staff." Compl. Ex. C. Nothing in the letter is false or defamatory.

Plaintiff has utterly failed to meet her burden of demonstrating the falsity of any statements, *Jacron Sales Co., Inc. v. Sindorf*, 350 A.2d 688, 698 (Md. 1976), and cannot show that Defendants published the letters to a third party "either with reckless disregard for [their] truth or with actual knowledge of [their] falsity." *Shapiro*, 661 A.2d at 217.

**B.      Who Made the Defamatory Statements**

Any communications to third parties suggesting that Plaintiff was committing fraud were sent not by Defendants, but by Plaintiff herself.  On June 8, 2009, Plaintiff sent a letter to Nicholson with copies to the Board of County Commissioners, HUD, the "Maryland State Prosecutor," the NAACP, and the Board of Leah's House.  Pl's Mot. Ex. 2.  In this letter Plaintiff stated that she had received Phillips' April 27, 2009 letter "accusing me of being fraudulent in contracting with [HASMC]" and requested evidence demonstrating "how *I* knowingly engaged fraudulently and with whom, in *my* quest to receive subsidies." Pl's Mot. Ex. 2 (emphasis added).  Similarly, in a second letter dated July 6, 2009 to the same recipients, Plaintiff asserted that "I am accused of being fraudulent in contracting with [HASMC]." Compl. Ex. T.  These two letters, not any communications by Defendants, make a direct connection between Plaintiff and purported fraudulent activity and were widely disseminated to third parties.

**C.      Damages**

"[W]hen a plaintiff establishes that the statement was made with actual malice, a presumption of harm to reputation arises from the publication of words actionable per se. . . . Therefore, where the statement is actionable per se, damages are presumed if a plaintiff can demonstrate constitutional malice; the jury may award general damages for false words that are

actionable per se, even in the absence of proof of harm." *Shapiro*, 661 A.2d at 217. Because Plaintiff has not demonstrated actual malice in the instant action, she must prove actual damages. *Id.*

Other than describing Defendants' intent to tarnish her reputation, Plaintiff does not allege any damages in Count I of her complaint. *See* Compl. ¶¶ 39-42. In Count II, she alleges that Defendants' statements "inexcusably exposed plaintiff to public hatred, contempt, and ridicule, and impeached plaintiff's honesty, integrity, virtue, and reputation as a person and as a member of plaintiff's profession, and as a direct result of defendant's acts, caused plaintiff substantial and great injury and damage," *id.* at ¶ 46, and injured Plaintiff "in her business, personal standing, reputation, and credit in the community," *id.* at ¶ 48.

However, Plaintiff has provided no evidence other than conclusory statements in her complaint to establish that she suffered any damages. Her vague health concerns and purported increased workload are not related to the reputational harm alleged in the complaint.

In sum, Plaintiff has failed to establish a prima facie case of defamation. There being no genuine issue of material fact, Defendants are entitled to judgment as a matter of law as to Counts I and II.

## III. Count III: Infliction of Emotion Distress

In Count III of her complaint, Plaintiff alleges that Defendants acted "with out [sic] regard to the effect [on] those associated with the defendant [sic] to include sheltered families and employees of the Leah's House organization," and that Defendants' actions "caused great physical challenges to the defendant [sic] who is disabled and whose health is affected by stress." Compl. ¶¶ 52-53.

To the extent that Plaintiff asserts a claim for *negligent* infliction of emotional distress,[10] it must be dismissed because the tort is not recognized in Maryland. *Lapides v. Trabbic*, 758 A.2d 1114, 1121-22 (Md. Ct. Spec. App. 2000).

Under Maryland law, to present a prima facie case of *intentional* infliction of emotional distress, a plaintiff must establish four elements: "(1) [t]he conduct must be intentional or reckless; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between the wrongful conduct and the emotional distress; [and] (4) the emotional distress must be severe." *Manikhi v. Mass Transit Admin.*, 758 A.2d 95, 113 (Md. 2000). Liability exists only for "conduct exceeding all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind." *Bagwell v. Peninsula Reg'l Med. Ctr.*, 665 A.2d 297, 319 (Md. Ct. Spec. App. 1995). "The requirements of the rule are rigorous, and difficult to satisfy." *Id.*

For the conduct to be extreme and outrageous, the Court of Special Appeals of Maryland has explained that "[t]he conduct must strike to the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung." *Hamilton v. Ford Motor Credit Co.*, 502 A.2d 1057, 1064 (Md. Ct. Spec. App. 1986). "[O]ne must suffer an emotional response so acute that no reasonable person could be expected to endure it. One must be unable to function; one must be unable to tend to necessary matters." *Id.* at 1064 (citations omitted).

Plaintiff has failed to meet this high burden. The alleged conduct falls far short of being extreme or outrageous in nature. Accordingly, summary judgment must be awarded in Defendants' favor as to Count III.

---

[10] In her First and Second Motions for Leave to Amend the Complaint, Plaintiff seeks to rename Count III "*intentional* infliction of emotional distress." Paper Nos. 17, 22 (emphasis added).

**IV.    Count IV: Conspiracy to Divert Funding**

In Count IV of her Complaint, Plaintiff alleges that Nicholson "conspired" with DSS to cut off funding from Leah's House, appending a large portion of her letter to the NAACP to support her allegations. *See* Compl. ¶ 56.  Although Count IV is not a model of clarity, the Court will construe Plaintiff's claims as one for civil conspiracy as well as discrimination and retaliation pursuant to 42 U.S.C. § 1983 and § 1985.

**A.    Civil Conspiracy**

Plaintiff argues that DSS' April 24, 2009 e-mail to HASMC, among other evidence, demonstrates that DSS and HASMC conspired to remove clients from Leah's House and cut off all funding to the organization. *See* Compl. ¶ 56.

"A claim for civil conspiracy requires proof of the following elements: 1) [a] confederation of two or more persons by agreement or understanding; 2) some unlawful or tortious act done in furtherance of the conspiracy or use of unlawful or tortious means to accomplish an act not in itself illegal; and 3) [a]ctual legal damage resulting to the plaintiff." *Lloyd v. Gen. Motors Corp.*, 916 A.2d 257, 284 (Md. 2007) (quotation marks omitted). Maryland courts have consistently held that "'conspiracy' is not a separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff." *Id.*

Plaintiff has failed to demonstrate the existence of any "agreement or understanding" between the alleged conspirators, or "actual legal damage" resulting from the purported conspiracy. Plaintiff's accusations are mere speculation and conjecture. Accordingly Defendants are entitled to judgment as a matter of law as to any claim of civil conspiracy.

**B.    Civil Rights Claims**

Plaintiff claims that both she and Leah's House were "subject to retaliation" from DSS and HASMC because of her "efforts to seek answers about this matter." Compl. ¶ 56.  Plaintiff

further appears to allege, in her letter to the NAACP (quoted in her Complaint and attached as an exhibit thereto) and in other documents in the record, that she was discriminated against on the basis of her religion and race. The retaliation that she purportedly suffered includes cancellation of the RAP contracts, cancellation of the DSS MOU, relocating her clients to permanent housing, as well as threats and intimidation. *See* Compl. Ex. N.

Any apparent § 1983 claim is meritless based on the evidence in the record. Plaintiff has not shown that any of the named Defendants acted under the color of law to intentionally deprive her of her rights secured by the Constitution or laws of the United States.  As to any claim arising under § 1985, Plaintiff has failed to establish a meeting of the minds between the Defendants or "demonstrate with specific facts that the defendants were motivated by a specific class-based, invidiously discriminatory animus to deprive the plaintiffs of the equal enjoyment of rights secured by the law to all," *Francis v. Giacomelli*, 588 F.3d 186, 197 (4th Cir. 2009).

Accordingly Defendants are  entitled to summary judgment as to Count IV.

## V.    Count V: Forgery

Count V alleges the lines for "Rent to be Charged for the Unit" on the Notices of Unit Availability were forged by HASMC as part of the overarching conspiracy against her and Leah's House. *See* Compl. ¶ 58. The Court will construe Count V as asserting a claim for fraudulent misrepresentation.[11] The elements of such a claim are:

> (1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation.

---

[11]    As with the proposed correction to Count III, in her First and Second Motions for Leave to Amend the Complaint, Plaintiff seeks to make Count V "Misrepresentation."  Paper Nos. 17, 22.

*Gourdine v. Crews*, 955 A.2d 769, 791 (Md. 2008).

Preliminarily, if the forms were altered after they left the custody of Plaintiff and Leah's House, Defendants did not make any representation to Plaintiff on the forms at all. Next, while the propriety of the $750 figure is unclear, there is no evidence that it falsely represented the regulatory maximum that Leah's House could receive, as determined by DHCD, or that it falsely represented some other actual measure of the market rent value of a room – or all four rooms – for a month at Leah's House. Accordingly, because Plaintiff has failed to make out a prima facie case elements of fraudulent misrepresentation by "forgery," Defendants are entitled to judgment as a matter of law as to Count V.

## VI.    Count VI: Violations of the Maryland Public Information Act

Plaintiff alleges in Count VI that HASMC's "refusal to release specific information to Marguerite Morris constituted a willful and purposed violation of the Maryland Public Information Act [(the "Act"), Md. Code Ann. State Gov't §§ 10-611 to 10-630]." Compl. ¶ 60. Plaintiff specifically cites her June 12, 2009 letter, "that was not responded to." *Id.* (citing Compl. Ex. O). Her June 12 letter was a duplicate of her earlier June 8 letter, stamped received by HASMC. *Compare* Compl. Ex. O, *with* Defs.' Mot. Ex. 2. Nicholson replied to the earlier letter, but his letter was not responsive to Plaintiff's five requests for information or documents. *Compare* Defs.' Mot. Ex. 2, *with* Compl. Ex. B.

Section 10-623 of the State Government Article of the Code of Maryland authorizes a person to file a complaint whenever "denied inspection of a public record." Md. Code Ann., State Gov't § 10-623(a).  When the provision has been violated, a court may "enjoin the [agency] from withholding the public record; . . . pass an order for the production of the public record that was withheld from the complainant; . . . for noncompliance with the order, punish the responsible employee for contempt," § 10-623(c)(3), as well as award "actual damages that the

court considers appropriate if the court finds by clear and convincing evidence that any defendant knowingly and willfully failed to disclose or fully to disclose a public record that the complainant was entitled to inspect," § 10-623(d)(1).

The Act, however, is limited to "permitting inspection of [] public record[s], with the least cost and least delay to the person or governmental unit that requests the inspection." § 10-612(b). To the extent Plaintiff's letter poses "interrogatories" to Nicholson, they are not covered by the Act. *See* § 10-611(g)(1) (defining "public record").

"A person or governmental unit that wishes to inspect a public record shall submit a written application to the custodian." § 10-614(a)(1). To the extent Defendants are not the custodians of the records Plaintiff seeks, and such records are "general source materials," that are "publically available at a library," Defs.' Reply 15, Plaintiff has no claim.

Remaining is Plaintiff's request for "[a] copy of your agenc[y's] standard operating procedures on how funds are designated and or shared with local area shelter providers." Compl. Ex. O. Under the Act, "[t]he defendant . . . has the burden of sustaining a decision to deny inspection of a public record." Md. Code Ann., State Gov't § 10-623(b). The Defendants do not address why such records were withheld, or argue that HASMC, Nicholson, and the Commissioners are not "custodians" of the requested record.[12]

However, Count VI may not survive summary judgment because, as discussed in Part I *supra*, Plaintiff has failed to comply with the LGTCA's notice requirement.

---

[12] Perhaps Defendants cannot make such an argument. Under the Act, a custodian includes any "authorized individual who has physical custody and control of a public record." Md. Code Ann., State Gov't § 10-611(c). Nicholson averred that he has "access to all records maintained by HASMC in the ordinary course of its business." Nicholson Mot. Aff ¶ 3.

**VII.    Motions for Leave to Amend Complaint**

Federal Rule of Civil Procedure 15 requires that a plaintiff seek leave of court to amend a complaint after twenty-one days have elapsed since the service of: (1) a responsive pleading (e.g., an answer, *see* Fed. R. Civ. P. 7(a)); or (2) a motion under Rule 12(b), (e), or (f).  *See* Fed. R. Civ. P. 15(a).  The earliest served responsive pleading or motion begins the twenty-one day period.  *See* Advisory Comm. Notes to 2009 Amends. to Fed. R. Civ. P. 15 ("The 21-day periods to amend once as a matter of course after service of a responsive pleading or after service of a designated motion are not cumulative. If a responsive pleading is served after one of the designated motions is served, for example, there is no new 21-day period.").

"The court should freely give leave [to amend] when justice so requires," *see* Fed. R. Civ. P. 15(a)(2), unless "the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile."  *Steinburg v. Chesterfield County Planning Comm'n*, 527 F.3d 377, 390 (4th Cir. 2008) (quotation marks omitted).  Amendments that plainly cannot survive a motion to dismiss are futile. *See Perkins v. United States*, 55 F.3d 910, 917 (4th Cir. 1995); *Frank M. McDermott, Ltd. v. Moretz*, 898 F.2d 418, 420-21 (4th Cir. 1990); *Classen Immunotherapies, Inc. v. King Pharms., Inc.*, 403 F. Supp. 2d 451, 459 (D. Md. 2005).

Here, Plaintiff filed her first Motion for Leave to Amend Complaint on December 3, 2009, *see* Paper No. 17, and her Second Motion for Leave to Amend Complaint on January 7, 2010, *see* Paper No. 22, both more than twenty-one days after Defendants filed their Motion to Dismiss or, in the Alternative, Motion for Summary Judgment on October 26, 2009, *see* Paper No. 8.  As a result, leave of court is required for Plaintiff to amend her complaint.  *See* Fed. R. Civ. P. 15(a). Leave will not be granted, however, as all proposed amendments would be futile.

In the proposed first amended complaint, Plaintiff adds the following information, none of which advances any of her claims: tax forms for the Three Oaks Center; semantic changes to the captions of Counts III; allegations about her emotional distress; an allegation concerning who altered the Notices; and revisions to her prayer for damages. *See generally* Paper No. 17. In the proposed second amended complaint, Plaintiff adds Leah's House as a plaintiff; adds Dena Bell and John Does 1-5 as defendants; includes a long discourse on the conspiracy against her and Leah's House; and makes the changes contained in her first amended complaint. *See generally* Paper No. 22. Again, these proposed modifications would not defeat summary judgment and are futile.

Accordingly, because all of Plaintiff's amendments are futile, her motions for leave to amend the Complaint will be denied.[13]

### **CONCLUSION**

For the foregoing reasons, the Court will: (i) grant Plaintiff's Motions for an Extension of Time to File the Opposition (Paper No. 14) and for Leave to File a Surreply (Paper No. 25); (ii) deny Plaintiff's Motions for Leave to Amend the Complaint (Paper Nos. 17 & 22), Motion for Waiver of the LGTCA Notice Requirement (Paper No. 13), and Motion for Entry of Default (Paper No. 26); (iii) grant Defendants' Motions to Dismiss, or, in the Alternative, for Summary

---

[13] Service appearing to be improper, Plaintiff's Motion for Entry of Default, Paper No. 26, as to Defendant Phillips shall also be denied. In addition, the Court will on its own motion, dismiss the claims against Defendants Phillips and Proctor for failure to comply with the LGTCA's notice requirement for the reasons set forth in this opinion.

Judgment (Paper Nos. 8 & 9); and (iv) deny as moot Defendants' Motion to Strike Jury Demand

(Paper No. 12) and Plaintiff's Motion Not to Strike Jury Demand (Paper No. 16).


August 17, 2010                          _____/s/_____
Date                                     Roger W. Titus
                                         United States District Judge